**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | | |
|---|---|---|
| AFFORDABLE WIRE MANAGEMENT, LLC, | ) ) | Civil Action |
| | ) | No. 3:25-cv-00283 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | ***Electronically Filed*** |
| CAMBRIA COUNTY ASSOCIATION FOR THE BLIND AND HANDICAPPED, INC., | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

        A.      Affordable Wire Management LLC and its Patented Technology ......................... 2

        B.      CAB Uses its Infringing ModulAir Product to Compete with AWM ................... 5

III.    LEGAL STANDARDS ....................................................................................... 9

IV.     ARGUMENT ...................................................................................................... 10

        A.      AWM Will Likely Succeed on the Merits ............................................................. 10

        B.      AWM Will Suffer Irreparable Harm Without Preliminary Injunctive Relief ....... 16

        C.      The Balance of the Equities Weighs Strongly in Favor of AWM ......................... 19

        D.      Entering Preliminary Injunctive Relief Is in the Public Interest ........................... 19

V.      CONCLUSION ................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) ................................................................................17

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
    644 F.3d 922 (Fed. Cir. 2012) ..................................................................................18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ..............................................................16, 17, 18, 19

*eBay, Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ..................................................................................................19

*Fresenius Kabi USA, LLC v. Fera Pharms., LLC*,
    No. 15-cv-3654, 2016 U.S. Dist. LEXIS 128126 (D.N.J. Sept. 20, 2016) .............15

*Genband US LLC v. Metaswitch Networks Corp.*,
    861 F.3d 1378 (Fed. Cir. 2017) ................................................................................16

*Janssen Prods., L.P. v. Lupin Ltd.*,
    109 F. Supp. 3d 650 (D.N.J. 2014) ..........................................................................19

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) .....................................................................................10

*LKRB Indus., LLC v. xuzhouaiyaxundianzishangwuyouxiangongsi*,
    No. 24-CV-1601, 2025 WL 531845 ...........................................................................9

*Metalcraft of Mayville, Inc. v. Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017) .....................................................................10, 19, 20

*Natera, Inc. v. NeoGenomics Labs., Inc.*,
    106 F.4th 1369 (Fed. Cir. 2024) ............................................................................9, 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................................10

*Power Survey, LLC v. Premier Util. Servs., LLC*,
    61 F. Supp. 3d 477 (D.N.J. 2014) ............................................................................19

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ................................................................................17

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)............................................................................18

*TEK Global, S.R.L. v. Sealant Sys. Int'l*,
    920 F.3d 777 (Fed. Cir. 2019)..............................................................................18

*Trebro Mfg. v. FireFly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014)............................................................................10

## I.     INTRODUCTION

Utility-scale solar plants are complex projects having numerous components that each require thoughtful design.  In order to maximize efficiency of the solar plant as a whole, each component must be fine-tuned to operate at peak performance while harmonizing with the rest of the installation's modules.  The backbone of solar installations is cable management systems. These systems serve as the framework for capturing and converting solar energy to useful, utility-scale electricity.  As design aspects of solar installations evolved over the years, the approach to cable management systems largely remained stagnant.  That is, until Affordable Wire Management pioneered and patented a modular cable hanger solution that results in the improvement of cable management system's ampacity—the ability to conduct a large amount of electrical current without overheating.  With its innovative design, Affordable Wire Management sparked an industry trend that not only seeks, but now demands, improved ampacity in cable management systems.

Problematically, Affordable Wire Management's direct competitor—CAB—is now attempting to free-ride off this patented, modular design to compete in the market.  For years, CAB has been a prominent distributor of cable hangers in the solar installation industry.  However, it failed to address the industry's concern—decreased ampacity of cables—with any design improvements to its product offerings.  And now that the industry demands such a solution, CAB's only option is to impermissibly and unlawfully use the patented, modular invention of Affordable Wire Management as a last-ditch effort to compete.  Specifically, CAB's ModulAir product, introduced to the market in late 2024, directly infringes the patented, modular innovation of Affordable Wire Management.  And, for the reasons detailed in this memorandum, CAB should be preliminarily enjoined from its continued, unlawful use of Affordable Wire Management's patented, modular invention.

## II.     BACKGROUND

### A.     Affordable Wire Management LLC and its Patented Technology

Dan Smith and Scott Rand founded Affordable Wire Management LLC in 2020 using their own funds and working out of their homes.  Ex. 1 (AWM Declaration) at ¶ 18.  The two had met years earlier while working at First Solar, a leader in solar technology.  *Id.* at ¶¶ 1-6.  From their time at First Solar and their education as electrical and mechanical engineers, the two men developed a deep understanding of large "utility-scale" solar projects.  *Id.* at ¶ 7.  Utility-scale solar projects can have thousands to hundreds of thousands of photovoltaic ("PV") solar panels— some solar farms are so large they can be seen from space.  *Id.* at ¶¶ 8-9; Ex. 2 (Josh Weiner Declaration) at ¶ 30.

These solar projects require other components besides solar panels, which are collectively known as "Electrical Balance of Systems," or "EBOS."  *Id.* at ¶ 10.  EBOS refers to everything that is necessary for the solar power plant to transport electricity from the solar panels to a power grid or storage device. EBOS components should minimize energy loss to maximize the amount of electricity that is ultimately delivered.  *Id.*

Cable management systems ("CMS") are a critically important EBOS component. Complex pathways of cables transport DC energy collected from the solar panels to an inverter for conversion to AC electricity.  These are very high-ampacity cables.  A high-ampacity cable is a cable that can conduct a large amount of electrical current (measured in amperes) without overheating.  *Id.* at ¶ 11.  The higher the ampacity, the better the current carrying capacity and the more electricity that the cables can safely transport for use or storage.  *Id.* at ¶ 11.

In the past, solar farms buried the cables underground.  *Id.* at ¶ 13.  Installation required heavy machinery and was costly and problematic.  *Id.*  Burying the cables also made it hard to maintain and repair them.  *Id.*  The most significant drawback with buried cables, however, was

heat build-up around the buried cables. To avoid overheating, engineers were required to "derate" the cables by reducing their current carrying capacity. This reduction in ampacity diminished the efficiency of the solar power. *Id.* at ¶ 14.

To address these problems, the industry moved to bundling cables above ground. *Id.* at ¶ 15. But the above-ground cable bundles continued to experience derate because the heat generated by cables touching one another in the bundle. *Id.* Bundled cables are also difficult to maintain and service. *Id.*; *see also* Ex. 3 (U.S. Patent No. 12,294,206 Patent) at 438-47; 7:45-48. The industry still needed a feasible solution to provide high-ampacity DC cables for solar system installations. *Id.*

Dan Smith and Scott Rand developed the solution—an extensible cable management system that could un-bundle the cables by separating them in both the horizontal and vertical directions. Figure 1 below shows AWM's marketing materials touting this innovation and depicting their CMS system where cables are separated in both the horizontal and vertical direction allowing air to circulate around the cables.



Figure 1

At the outset, AWM efforts focused substantially on the development of a modular cable hanger. *Id*. at 21. Design flexibility was an essential requirement for AWM's development of a next-generation product. *Id*. No two solar energy generation facilities are the same. So, every project must be engineered to accommodate the specified PV panels and other design parameters. *Id*. Modularity is a key part of this design flexibility. *Id*.; Ex. 2 at ¶ 29.

It took almost a year for AWM to complete the product market fit analysis and iterative design work through prototyping and UL testing (UL stands for Underwriters Laboratories, a global safety certification company). *Id*. at ¶ 24. In early 2021, AWM sold and delivered its first CMS product to a customer. *Id*. In 2022 they moved into leased office and research space and formally launched AWM's present generation of cable hangers with the product name Arden, which separates cables both horizontally and vertically. *Id*.

Recognizing the value in its novel approach to solving problems in the solar market, AWM promptly sought patent protection for its innovative modular cable hanger design. To that end, AWM filed a provisional patent application in April of 2020. *Id*. at ¶ 43. The patent asserted in this action, U.S. Patent No. 12,294,206 ("'206 Patent"), flows from that provisional patent application and issued this year, in May 2025. A key part of the claimed invention is a modular cable hanger extension that hooks onto a cable hanger to increase cable capacity and separation in the vertical direction. Notably, AWM has not licensed any of its patents to anyone, including the '206 Patent. *Id.* Nor does it intend to do so.

In 2024, AWM experienced significant growth in the amount of installation projects completed and tripled the amount of employees to nine. *Id*. at ¶ 25. The design flexibility of AWM's Arden CMS was driving commercial success. *Id*. Specifically, the Arden product demonstrated as much as a 20% improvement in ampacity benefit over other CMS products— including CAB's then-existing cable hanger product line. *Id*. Increasingly, the industry began to demand cable arrangements and ampacity improvements provided by the Arden.

### B.    CAB Uses its Infringing ModulAir Product to Compete with AWM

When AWM was founded in 2020, its only relevant competitor was CAB. In fact, "[p]rior to AWM's existence, CAB had approximately 100% market share" for cable hangers in the solar industry. Ex. 1 at ¶ 18; Ex. 2 at ¶ 4. CAB's cable hangers separated cables horizontally but the cables were still bundled on top of each other as shown below in Figure 2. Ex. 1 at ¶ 23. These configurations suffered from exactly the problems that AWM's patented innovation and Arden products solved. CAB's cable hanger products had not evolved in years, and lacked the design flexibility to accommodate the new cable arrangements and ampacity targets demanded by the industry. *Id*. at ¶ 23.



Figure 2

Just as AWM was gaining success with its Arden products, CAB introduced a new modular cable hanger product that separated cables both horizontally and vertically—just like AWM's. *Id*. at ¶ 26. The product was launched in September 2024 and was called ModulAir. As the name suggests, the cable hanger is advertised as a modular system for cable separation which allows better airflow around the cables, leading to better performance and eliminating the need for derating of the cables. *Id*. Using the proprietary configurations claimed and disclosed in AWM's '206 Patent, ModulAir includes a modular cable hanger extension that hooks onto a cable hanger to increase cable capacity and separation in the vertical direction. ModulAir is shown in Figure 3 with one extension shown on the left image, and two extensions on the right.

 

Figure 3

At all times since AWM was formed until now, AWM and CAB have been direct, head-to-head competitors in an effectively two-player market. *Id*. at ¶ 28; *see also* Ex. 2 at ¶¶ 3-4. That

is, CAB is AWM's only true competitor in the market segment of CMS products for utility-scale solar projects. AWM estimates that AWM and CAB, together, capture more than 95% of the market. Ex. 1 at ¶ 28.

The market in which AWM and CAB compete is a small, niche market. *Id.* at ¶ 29. AWM's Arden CMS and CAB's ModulAir are directly competing goods, advertised in the same marketing channels to the same potential customers, and touted to have the same features and benefits. *Id.* AWM and CAB directly compete for the same customers and opportunities with these directly competing products. *Id.* A project "win" for CAB, and the ModulAir product, on an installation project is a loss for AWM. *Id.*; *see also* Ex. 2 at ¶ 4. The CMS market tight, with only a few large-scale project opportunities each year. Ex. 1 at ¶ 30. Each lost opportunity immediately hampers both AWM's ability to grow customer relationships and build product familiarity. *Id.*; Ex. 2 at ¶ 17. A "loss" on any opportunity is likely to have a significant negative impact on AWM's ability to "win" future projects, causing an increasingly severe competitive disadvantage over time. Ex. 1 at ¶ 30; Ex. 2 at ¶ 17.

The customer for CMS products is primarily the Engineering, Procurement, and Construction ("EPC") firm that manages the solar project installation. *Id.* at ¶ 31. An Engineer of Record ("EOR") is also important, having the final say on the design plans, including what products and components are specified in the plans. Ex. 2 at ¶ 18. Each project opportunity is a competitive bid, design-win environment. *Id.* at ¶ 33; Ex. 2 at ¶ 19. Whatever CMS product is chosen and specified for the installation will be the only CMS product for that installation, including any modifications or expansions over time. Ex. 1 at ¶ 33. AWM knows whether AWM or CAB has "won" a project when the EOR stamps the approved design plan with the selected CMS product specified into the final project design. *Id.* at ¶ 34.

After CAB launched its ModulAir cable hanger product in September of 2024, AWM promptly experienced substantial competitive bid losses on installation projects where it would have been extremely difficult, if not impossible, for CAB to effectively compete with any of its pre-ModulAir products. *Id*. at ¶ 35-38. In short, CAB's infringing product ModulAir has already caused AWM to lose multiple projects.

One example of such a loss concerns a large solar farm installation project located in Colorado. The EPC firm for the project was Moss Solar, a large, established EPC. Ex. 1 at ¶ 36. Moss Solar is increasingly demanding higher ampacity targets and less derating of cables in its project designs. *Id*. AWM's innovative approach, and specifically the design flexibility of the Arden cable hanger, was attractive to Moss Solar because it would optimize cable grouping and spacing and provide higher ampacity. *Id*. AWM was hoping to have its CMS product specified into the Colorado solar farm project. *Id*. But in early 2025, AWM learned that CAB's ModulAir cable hanger, which had just been commercially launched months earlier, had been specified as the CMS in the design plans for the Colorado project. *Id*. at ¶ 37. Prior to the launch of ModulAir, CAB's existing cable hanger products could not satisfy the design requirements and ampacity targets for the project. *Id*. Without ModulAir, CAB cannot effectively provide the required ampacity for cables on such large installation projects. *Id*.

This was not the only loss AWM experienced because of ModulAir. AWM learned another opportunity, one with its most significant customer, had specified the ModulAir product as the CMS based upon the cable grouping and spacing requirements in the design plan. *Id*. at ¶ 38. AWM lost this bid only because CAB was able to leverage its ModulAir CMS product with its ability to separate cables both horizontally and vertically. *Id*. at ¶ 39. No other CAB product offering would have been an acceptable CMS solution for the specified design plans. *Id*.

It seems that when CAB (the largest player in the market) gets its ModulAir product specified into a project's design, AWM is completely boxed out. *Id*. at ¶ 40. AWM may not even see future project opportunities where the ModulAir product is specified into a design plan. *Id*.; *see also* Ex. 2 at ¶¶ 5, 27. With ModulAir, CAB is unlawfully using AWM's patented technology to compete directly against AWM even though it has not, and has no interest, in granting CAB permission to use AWM's patented technology. "CAB Solar's commercialization of a modular cable hanger effectively erodes AWM's ability to exploit its innovation and first-mover status as the CMS supplier which developed a modular cable hanger." Ex. 2 at ¶ 28.

## III.    LEGAL STANDARDS

"The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *LKRB Indus., LLC v. xuzhouaiyaxundianzishangwuyouxiangongsi*, No. 24-CV-1601, 2025 WL 531845; 2025 U.S. Dist. LEXIS 29387 at *7 (W.D. Pa. Feb. 18, 2025) (*quoting eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)). When deciding whether to grant a preliminary injunction in a patent case courts evaluate four factors. "(1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm in the absence of an injunction; (3) that this [harm] would exceed harm to the opposing party; and (4) that the public interest favors such relief." *Id*. at *7-8; *see also Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024) (evaluating the four preliminary injunction factors). Evaluating these factors is fact dependent and no one factor is dispositive. *LKRB Indus., LLC* at *8. "Rather, the Court must 'weigh and measure each factor against the other factors and against the foim and magnitude of the relief requested." *Id*. (quoting *Hybritech v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)). Because procedures are less formal and the evidence is less complete at this stage of the case, the court "may rely on affidavits and hearsay materials which would not be admissible

evidence" and determine the appropriate weight of those materials based on the facts of the case. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).

## IV.    ARGUMENT

An injunction preventing CAB from selling its ModulAir product in the United States should issue here because:  (1) AWM is likely to succeed on the merits, (2) it is likely that AWM will suffer irreparable harm absent preliminary relief, (3) the balance of equities tips decidedly in AWM's favor, and (4) enjoining the infringing ModulAir product is in the public interest.  *Natera, Inc.*, 106 F.4th at 1375.

### A.    AWM Will Likely Succeed on the Merits

To show likelihood of success on the merits, "a patentee must show that it will likely prove infringement of the asserted claims and that its infringement claim will likely withstand the alleged infringer's challenges to patent validity and enforceability."  *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017).  "[A] patentee must prove that success in establishing infringement is 'more likely than not.'"  *Trebro Mfg. v. FireFly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (quotations removed).  "To prove an accused product literally infringes the patent in suit, the product must contain each and every limitation of the asserted claim(s)."  *Trebro Mfg.*, 748 F.3d at 1166.  The asserted claim's terms are generally given their ordinary meaning as understood by persons skilled in the art in question at the time of the invention.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  There are only two exceptions to this general rule:  (1) where the patentee clearly provides a special definition for a particular claim term, or (2) the patentee clearly disavows the ordinary scope of a claim term in the specification or during prosecution.  *Id.* at 1316.  Neither of those exceptions apply here and, thus, the patent's claims should be afforded their plain and ordinary meaning.

CAB's ModulAir product literally infringes each element of Claim 1 (and others) of the '206 Patent. *See* Ex. 4 ('206 Infringement Chart – ModulAir). Some patent infringement cases involve highly complex patent claims, such as cases involving semiconductor design or software source code. Not here: AWM's innovative patent elegantly solves major problems in the prior art using approachable terms that can be applied with ease while observing the infringing ModulAir device, as demonstrated below. Taking each element of the first independent claim in turn, it is clear that CAB's ModulAir practices Claim 1 (and others), and the likelihood of AWM's success in this regard is likewise apparent.

**Claim 1(preamble):** *A cable hanger, comprising:*

CAB's ModulAir product meets the preamble, "A cable hanger, comprising," because it is "a cable hanger." Ex. 4 at 3.

**Claim 1(a):** *a first support member including a proximal end and a distal end, wherein a bottom surface is positioned at the distal end:*

As shown in Figures 1 and 2 below, CAB's ModulAir product meets claim element 1.A because it has a first support member with a proximal end and a distal end with a bottom surface positioned at the distal end. The support member supports the weight of the cables, with its proximal end situated near the point of attachment and its distal end situated away from the point of attachment. The bottom surface of the support member is at the distal end. Ex. 4 at 4.





Figure 1                                            Figure 2

**Claim 1(b):** *a first hook arranged at the proximal end of the first support member and configured to attach the cable hanger to a support wire;*

As shown in Figures 3 and 4 below, CAB's ModulAir product clearly meets claim element 1.B because it has a first hook arranged at the proximal end of the first support member and configured to attach the cable hanger to a support wire. The Figures below shows the proximal hook attaching the support member to a support wire. Ex. 4 at 4-5.





Figure 3                                            Figure 4

**Claim 1(c)-(d):** *a first saddle positioned on the first support member; a second saddle positioned horizontally adjacent to the first saddle;*

As shown in Figures 5 and 6 below, CAB's ModulAir product clearly meets claim element 1.C because it has a two saddles positioned horizontally to each other. Specifically, it has

a first saddle (which is shaped to fit and support cables), that is positioned on the first support member; a second saddle positioned horizontally adjacent to the first saddle.  Ex. 4 at 5-6.



Figure 5                                                Figure 6

**Claim 1(e):**  *and a saddle extension, comprising:*

CAB's ModulAir product also has a saddle extension.  This is the bottom portion that can be seen hooking onto the outer saddles of the first support member, including hooking onto the first saddle as shown in Figures 7 and 8 below.  This extends the number of saddles available to support cables in the ModulAir product.  Ex. 4 at 6-7.





Figure 7                                                Figure 8

**Claim 1(e)(i)-(ii):**  *a second support member having a proximal end and a distal end; a third saddle positioned on the second support member;*

Again, as detailed in the annotated Figures 9 and 10 below, the ModulAir hanger plainly

meets claim element 1.D.1 because its saddle extension comprises a second support member with

an additional (third) saddle on it.  Ex. 4 at 8-10.



Figure 9                                    Figure 10

**Claim 1(e)(iii):**  *and a second hook arranged on the proximal end of the saddle extension and configured to attach to the first saddle to connect the saddle extension to the first saddle, wherein the second hook extends vertically above the bottom surface of the first support member.*

As shown in Figures 11 and 12, the ModulAir product plainly practices claim

element 1.D.2 because its saddle extension is connected to the first saddle using a hook that extends

up and over the bottom of the first saddle.  Ex. 4 at 11.



Figure 11                    Figure 12

Because every claimed element of Claim 1 of the '206 Patent is met by the ModulAir, as demonstrated in the element-by-element comparison of the claim language to the product above, it infringes at least Claim 1 of the '206 Patent.

In addition to being infringed by CAB's ModulAir Product, the '206 Patent is valid. Indeed, patents are presumed valid, and CAB will not be able to raise a substantial question of invalidity with respect to the '206 Patent. *See Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-cv-3654, 2016 U.S. Dist. LEXIS 128126, at *7-17 (D.N.J. Sept. 20, 2016). Notably, prosecution of the '206 patent was thorough, but smooth: the Patent and Trademark Office reviewed approximately seventy-five different prior art references when considering the validity of the '206 patent claims, did not reject any throughout prosecution, and issued the patent within just seven months of its filing. This ease of prosecution makes sense, too, because AWM's patent reflects true innovation: recognizing the solar industry's long-felt need for increased ampacity in solar cable management systems, creating a new and novel solution for that need, and disclosing the innovation in its patent. No other company sought to address this problem of increasing

ampacity in cable management systems, and no other company has offered a modular solution for doing so like AWM. This ingenuity embodies the bedrock of our patent system, and the *quid pro quo* for AWM's innovative contribution to the solar industry is the right to exclude others—like CAB—from practicing its invention. Had it not been for AWM's recognition of, and solution for, the solar industry's problem with overheating and decreased ampacity of cable management systems, utility-scale solar installations would still be relying on prior non-modular cable hanger solutions that suffer from overheating, derating, and decreased ampacity. AWM's organic innovation—and the demonstrable ease in obtaining a patent for it—is a persuasive factor supporting the conclusion at this stage of the proceedings that the '206 Patent is not just presumed to be valid, it *is* valid.

For at least these reasons, AWM is likely to succeed on the merits of its infringement claims.

## B.    AWM Will Suffer Irreparable Harm Without Preliminary Injunctive Relief

In determining whether a patentee will suffer irreparable harm absent an injunction, the court may consider factors such as the nature of competition between the patentee and the infringer, the willingness of a patentee to license, and any lost sales the patentee has suffered. *Douglas Dynamics, LLC,* 717 F.3d at 1344-45. There must also be "some connection" between the likely harm and the infringing acts. *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1383 (Fed. Cir. 2017) ("a causal nexus linking the harm and the infringing acts [is] to ensure that an injunction is not entered on account of irreparable harm caused by otherwise lawful competition.").

Here, AWM has already suffered and will likely continue to suffer irreparable harm directly attributed to CAB's infringing behavior. CAB's ModulAir product directly competes with AWM's Arden cable hangers and has increased CAB's market share while decreasing AWM's.

Ex. 1 at 34-40.  Before ModulAir, CAB could not satisfy the ampacity targets for some larger projects.  *Id.* at ¶¶ 26-27, 35-37.  Using AWM's patented modular technology CAB has been able to separate cables both horizontally and vertically to increase ampacity.  *Id.* at ¶ 26-27.  This swiftly led to AWM losing bids for large solar projects to ModulAir. *Id.* at ¶¶ 35-41.  Thus, by infringing, CAB has increased its share of the market while simultaneously harming AWM by decreasing its share of the market.

This harm to AWM is irreparable.  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351 (Fed. Cir. 2012) ("[where] two products occupy the same markets, and that [defendant] was at times seen as [patentees] only true competitor. … Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").  This harm is especially acute here: once a supplier wins a project bid with a customer, the customer effectively commits itself to that supplier for the entirety of the project.  Ex. 2 at ¶ 23; *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1337 (Fed. Cir. 2013) (irreparable harm where "incumbency effect" arose from the "design wins").  Further, once the supplier successfully completes a project with the customer, the customer tends to standardize its business operations around that supplier's products, leading to further project bid wins for the supplier.  Ex. 2 at ¶¶ 23-24 (listing reasons why suppliers tend to standardize business operations around CMS supplier's products and describing "sticky" customer relationships where "a symbiotic, interdependent, long-term relationship develops.").  Thus, once AWM loses a project bid to CAB based on CAB's unlawful use of AWM's patented invention,

that loss is amplified in immeasurable and irreparable ways. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 644 F.3d 922 (Fed. Cir. 2012) ("As the district court explained: 'There is no effective way to measure the loss of sales or potential growth . . . . Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Thus, AWM has been irreparably harmed by losing market share to a direct competitor in a niche market who is using AWM's own patented technology to win bids against it. In view of exactly this sort of acute competitive harm, the Federal Circuit has repeatedly endorsed preliminary injunctions issued to protect plaintiffs like AWM. *TEK Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 793 (Fed. Cir. 2019) (affirming injunction where "[t]he district court found, and the record supports, that [infringer and patentee] were competing for the same customers in the same market, that [infringer] won business over [patentee], and that [patentee] was susceptible to lowered market share due to this loss of business."); *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1151 (Fed. Cir. 2011) (concluding that the district court erred in not finding irreparable harm when the parties were direct competitors and patentee showed lost market share and access to potential customers). AWM has been irreparably harmed in other ways too. In patent infringement cases, "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC,* 717 F.3d at 1344. Irreparable reputational harm also includes harm to one's reputation as an innovator. *Id*. at 1345. A company's reputation can also be irreparably damaged where its distributors believe the company does not enforce its intellectual property rights. *Id*. This is especially true here, where AWM wants to maintain market exclusivity and therefore does

not license its intellectual property. *Id*. AWM is suffering all these irreparable harms, especially as it markets itself as an innovator. *See Supra* Fig. 1, Ex. 1 at ¶¶ 18-21, 36, 41.

### C.      The Balance of the Equities Weighs Strongly in Favor of AWM

The balance of the equities weighs decidedly in favor of AWM. If AWM's request for a preliminary injunction is denied, AWM will continue to be forced to compete against its own invention and suffer significant lost opportunities to further develop the market for ampacity optimized cable hangers. *See Metalcraft*, 848 F.3d at 1369. Moreover, AWM is a small new entrant in the market, just getting its footing, with its Arden cable hangers being its core product. If AWM continues to lose sales the ModulAir, it could have existential consequences. CAB, on the other hand, has many lines of products, including non-accused hangers and products outside the solar industry, including in mining/tunneling; oil, gas, and pipeline; electrical/utility; shipbuilding/maritime; sewing and assembly; and traffic and communication. This weighs in favor of granting the preliminary injunction. *Power Survey, LLC v. Premier Util. Servs., LLC*, 61 F. Supp. 3d 477, 487 (D.N.J. 2014) ("Granting the injunction, would only affect one line of Defendants' businesses. By contrast, Power Survey's major revenue source is the mobile stray voltage detection services, it would face a greater comparative hardship if the injunction were not granted.").

### D.      Entering Preliminary Injunctive Relief Is in the Public Interest

No countervailing facts show that the public interest would be disserved by injunctive relief—in fact, the public interest would be served by a preliminary injunction. *See eBay*, 547 at 391; *LKRB Indus.*, 2025 U.S. Dist. LEXIS 29387, at *47-48 ("Patents would be of little value if [Defendants] could not be prevented from selling infringing products."). The public interest favors protecting patent rights because "the 'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" *Janssen Prods., L.P.*

*v. Lupin Ltd.*, 109 F. Supp. 3d 650 (D.N.J. 2014) (quoting *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006)).  Here, the harm to the public is nonexistent.  AWM is ready and able to supply the market with cable hangers that can replace the infringing products.  *See Metalcraft*, 848 F.3d at 1369.  In these circumstances, the public interest strongly weighs in favor of preliminary injunctive relief.

## V.    CONCLUSION

For the foregoing reasons, AWM respectfully requests that the Court enter a preliminary injunction enjoining CAB's ModulAir devices.

Respectfully submitted,

**THE WEBB LAW FIRM**

Dated: September 3, 2025

s/ *Kent E. Baldauf, Jr.*
Kent E. Baldauf, Jr. (PA ID No. 70793)
Bryan P. Clark (PA ID No. 205708)
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
412.471.8815
412.471.4094 (fax)
kbaldaufjr@webblaw.com
bclark@webblaw.com

*AND*
Matthew S. Galica (*PHV Forthcoming*)
James Wodarski (*PHV Forthcoming*)
Williams S. Dixon (*PHV Forthcoming*)
**MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
617.542.6000
617.542.2241 (fax)
msgalica@mintz.com
jwodarski@mintz.com
wsdixon@mintz.com
*Attorneys for Plaintiff*

No. 3:25-cv-00283

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of September, 2025, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which sent notification to all counsel of record.

**THE WEBB LAW FIRM**

s/ *Kent E. Baldauf, Jr.*
Kent E. Baldauf, Jr.